09-5117-cr
U.S. v. Simels

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2010

Heard: April 29, 2011            Decided: August 12, 2011

Docket Nos. 09-5117-cr(L), 10-152-cr(XAP)

- - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,
      Appellee-Cross-Appellant,

                    v.

ROBERT SIMELS,
      Defendant-Appellant,

ARIENNE IRVING,
      Defendant-Cross-Appellee.
- - - - - - - - - - - - - - - - - -

Before: NEWMAN, CALABRESI, and HALL, Circuit Judges.

Appeal from the December 8, 2009, judgment of the United States District Court for the Eastern District of New York (John Gleeson, District Judge), sentencing a lawyer for attempted obstruction of justice and bribery and for importing electronic surveillance devices. Appellant challenges, among other things, the Government's use of a confidential informant to meet with the lawyer and discuss the defense of the lawyer's client. These meetings, which were recorded, revealed the lawyer's plans for the bribery and intimidation of potential trial witnesses against his client, who subsequently pled guilty.

Convictions on counts relating to attempted obstruction of justice and bribery affirmed; counts relating to electronic surveillance devices vacated; and case remanded for entry of a corrected judgment.

> Barry A. Bohrer, New York, N.Y. (Elkan Abramowitz, James R. Stovall, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, N.Y., on the brief), for Defendant-Appellant.
>
> Daniel D. Brownell, Asst. U.S. Atty., Brooklyn, N.Y. (Loretta E. Lynch, U.S. Atty. Eastern District of New York, David C. James, Asst. U.S. Atty., Brooklyn, N.Y., on the brief), for Appellee-Cross-Appellant.

JON O. NEWMAN, <u>Circuit Judge</u>.

This appeal by a lawyer convicted of offenses involving attempted obstruction of justice implicates issues concerning the Government's use of a confidential informant to pursue an investigation of the lawyer's conduct during his preparation of the defense of his client. Robert Simels appeals the December 12, 2009, judgment of the United States District Court for the Eastern District of New York (John Gleeson, District Judge), sentencing him principally to fourteen years' imprisonment after a jury trial. Simels was convicted of one count of conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(b)(1), (b)(2)(A); eight counts of attempted obstruction of justice, in violation of 18 U.S.C. § 1512(b)(1), (b)(2)(A); one count of bribery, in violation of 18 U.S.C. § 201(c)(2); and one count each of importation and possession of electronic surveillance equipment, in violation of 18 U.S.C. § 2512(1)(a), (b).

We conclude that, in the circumstances of this case, the Government's use of the informant was entirely proper, that the convictions concerning the surveillance equipment should be vacated, and that the convictions on all other counts should be affirmed. We

-2-

therefore affirm in part, vacate in part, and remand for entry of a corrected judgment.

Background

The case against Simels concerned his representation of Shaheed Khan, also known as Roger Khan (and occasionally referred to as Shaheed Roger Khan). In June 2006, Khan, a citizen of Guyana, was arrested in Suriname and transported to the United States to face narcotics trafficking charges. Khan was accused of being the leader of a criminal enterprise importing large amounts of cocaine into the United States. He was detained at the Manhattan Correctional Center ("MCC"). Khan hired Simels, a well known defense attorney, agreeing to pay him a retainer of $1.4 million.

The evidence against Simels came primarily from the testimony of Selwyn Vaughn and recorded conversations of meetings between Simels and Vaughn. Vaughn had worked for Khan's paramilitary organization in Guyana, known as the "Phantom Squad," and became an informant working for the Drug Enforcement Administration ("DEA") in September 2006.

Vaughn's first contact with Simels occurred in March 2007 as a result of a conversation Vaughn had with Glen Hanoman, a lawyer in Guyana, whom Judge Gleeson found was a member of the conspiracy to obstruct justice. Hanoman told Vaughn that Khan "had" a guard in the prison where Khan was incarcerated and that the guard was prepared to help Khan escape. Vaughn brought this information to the DEA. The DEA instructed Vaughn to contact Khan. Vaughn called Hanoman in Guyana and asked for "contacting information" for Khan's attorney. Apparently receiving Simels's phone number, Vaughn telephoned Simels

-3-

and said he was a friend of Khan's and hoped to visit him.   Simels told Vaughn that Khan was in isolation and that only certain persons could visit him.   According to a DEA agent's debriefing report of Vaughn's account of this phone call with Simels, Vaughn informed Simels that "maybe" he "could assist with the defense" of Khan.

In March 2008, federal agents learned that Simels had attempted to speak with David Clarke, a federal prison inmate and potential Government witness against Khan.   Simels falsely told prison authorities that he was Clarke's attorney.

In April 2008, Vaughn learned in phone calls with members of Khan's gang in Guyana that Khan wanted Vaughn to speak with Simels. Vaughn notified DEA agents of the messages he had received to contact Simels, and, according to Vaughn's testimony, the agents "directed" him to speak with Simels.   On five occasions between May and September 2008, Vaughn met with Simels at Simels's law offices.        Vaughn surreptitiously recorded all five meetings.   In these meetings, Simels made the statements that formed the basis for his convictions for the obstruction of justice offenses.   In brief, he proposed bribing and threatening potential witnesses against his client, Khan.   We detail this evidence below in considering Simels's challenge to the sufficiency of the evidence.

In addition to the recordings of Simels's conversations with Vaughn, the Government obtained court authorization to record communications between Simels and Khan in the attorney's visiting room at the MCC.   The Government recorded a July 29, 2008, meeting between Simels and Khan. On September 10, DEA agents executed a warrant to

–4–

search Simels's office and seized records, money, and computers.  That same day, Simels was arrested along with his co-defendant Arienne Irving, an associate in his office.

On September 18, 2008, the grand jury indicted Simels and Irving for various offenses and returned a superseding indictment on July 10, 2009.  Count One charged a conspiracy to influence and prevent the testimony of witnesses in Khan's upcoming trial and to cause and induce witnesses to withhold testimony from that trial, in violation of 18 U.S.C. §§ 1512(b)(1), 1512(b)(2)(A), 1512(i), 1512(j), 1512(k), and 3551 *et seq.* Counts Two through Nine charged attempts to obstruct justice with respect to each of eight potential witnesses in Khan's trial, in violation of 18 U.S.C. §§ 1512(b)(1), 1512(b)(2)(A), 1512(i), 1512(j), 2, and 3551 *et seq.*[1] Count Ten charged bribery of a potential witness. in violation of 18 U.S.C. §§ 201(c)(2), 2, and 3551 *et seq.*  Count Eleven charged Simels alone with making a false statement, in violation of 18 U.S.C. §§ 1001(a)(2) and 3551 *et seq.* by falsely claiming to prison officials that he represented a prison inmate, later identified as David Clarke.  Count Twelve charged sending in foreign commerce electronic devices designed to intercept electronic communications, in violation of 18 U.S.C. §§ 2512(1)(a), 2, and 3551 *et seq.*, and Count Thirteen charged possession of such devices, in violation of 18 U.S.C. §§ 2512(1)(b), 2, and 3551 *et seq.*

On March 16, 2009, Khan, Simels's client, pled guilty to

---

[1]Although worded the same as Counts Two through Four and Six through Nine, which were captioned "Attempt to Obstruct Justice," Count Five was captioned "Attempted Witness Tampering."

narcotics, weapons, and obstruction of justice offenses. In his plea agreement he waived any claims that the Government's investigation violated his rights under the Fourth, Fifth, and Sixth Amendments and also waived all work-product and attorney-client privilege claims with respect to the investigation of Simels.

Before Simels's trial, he moved to suppress the MCC recordings for failure to comply with the minimization requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.* ("Title III"). The District Court granted the suppression motion. *See United States v. Simels*, No. 08-CR-640, 2009 WL 1924746 (E.D.N.Y. July 2, 2009) ("*Simels I*").

At trial, Simels's counsel told the jury in his opening statement that Simels would testify in his own defense, which he did. The Government moved *in limine* to use portions of the previously-suppressed MCC tapes to impeach Simels on cross-examination, and the District Court granted that motion. *See United States v. Simels*, No. 08-CR-640, 2009 WL 4730232, at *5-*11 (E.D.N.Y. Dec. 4, 2009) ("*Simels II*").

Simels was found guilty on all counts except Count Eleven, charging a false statement at a prison. Irving was found guilty on the conspiracy count, two attempted obstruction counts, and the two counts relating to electronic surveillance devices. The District Court granted her post-trial motion for a judgment of acquittal on these counts. *See United States v. Irving*, 682 F. Supp. 2d 243, 249 (E.D.N.Y. 2010). The Government's cross-appeal, No. 10-152, which sought to challenge that ruling, was dismissed by stipulation.

Simels was sentenced primarily to a prison term of 14 years' imprisonment.

## Discussion

Simels makes several arguments on appeal: (1) the Government's use of Vaughn invaded Simels's attorney-client relationship with Khan in violation of the Sixth Amendment, (2) the evidence was insufficient to support conviction on five of the eight substantive attempted obstruction of justice counts, (3) several of the District Court's evidentiary rulings deprived Simels of a fair trial, (4) the District Court erred in permitting use of the suppressed recorded conversation to impeach Simels, (5) the electronic surveillance device counts should have been dismissed, and (6) the sentence was procedurally and substantively unreasonable.

## I. Sixth Amendment Claim

The use of a Government informant to meet with a defense lawyer and discuss the defense of a pending criminal case against the lawyer's client potentially raises serious issues concerning the Sixth Amendment rights of the lawyer's client and other issues arising from intrusion into the attorney-client relationship. "Unquestionably, government interference in the relationship between attorney and defendant may violate the latter's right to effective assistance of counsel." *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985). Recognizing the potential issues, the Government sought to create what it calls a "fire wall" between the agents investigating obstruction offenses by Simels and the team of prosecutors and agents involved in the criminal case against Simels's client, Khan.   The resulting

procedures were designed to prohibit disclosure of information collected during the investigation of Simels to the Khan prosecution team.  On this appeal, Simels makes no claim that  the fire wall was breached.  Instead, he contends that the Government violates the Sixth Amendment right to counsel "when it deliberately directs an informant to pose as part of the defense and the invasion prejudices the defendant." Brief for Appellant at 98.  Because of this intrusion, he argues, all of Vaughn's testimony and his recorded conversations with Simels should have been suppressed.

The District Court rejected this claim on several grounds in an oral ruling.  First, the Court ruled that Simels was not protected by the Sixth Amendment at the time his conversations with Vaughn were recorded because the recordings were made before Simels was either arrested or indicted. Second, the Court ruled that, to the extent Simels was claiming that the Government must have some basis to suspect wrongdoing before it can intrude into an attorney-client relationship, there was no constitutional requirement of such a prior basis (what the Court called a "predication"), and, if there were such a requirement, it was met in this case.  Third, the Court ruled that any claim of work-product privilege belonged to Simels's client, Khan, and that Khan had waived such a claim in his plea agreement.

On appeal, Simels asserts violation of the Sixth Amendment right of his client (who had been indicted prior to the recordings), and contends that he should be accorded third-party standing to assert Khan's rights. *Compare U.S. Dept. of Labor v. Triplett*, 494 U.S. 715, 720-21 (1990) (attorney granted third-party standing to challenge

-8-

restrictions on attorney's fee), *and Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989) (attorney granted third-party standing to assert that forfeiture of property violated client's Sixth Amendment rights), *with Conn v. Gabbert*, 526 U.S. 286, 292 (1999) (the attorney "clearly had no standing to raise the alleged infringement of the rights of his client").

Because the law is unclear as to an attorney's third-party standing in the context of a Government investigation of the attorney while preparing his client's defense and the issue is rendered further in doubt by the fact that the client has pled guilty, we will assume that Simels can assert a Sixth Amendment right on behalf of his client and consider the merits of the claim.

The possibility that an attorney is attempting to obstruct justice in the course of representing a client presents Government investigators with a sensitive choice. If they act precipitously to determine whether obstruction is being attempted, they risk an unwarranted intrusion into the attorney-client relationship, an intrusion that may well jeopardize their case against the client. On the other hand, if they unduly delay an inquiry, they risk serious harm to witnesses. Whether or not investigators facing this choice are constitutionally required to have a reasonable basis for their suspicion of possible obstruction before sending an informant to contact the lawyer, the existence of such a basis adequately allays any concern that the attorney-client relationship has been improperly invaded.

In the pending case, Judge Gleeson found a sufficient basis in

the averments set forth in the affidavit of DEA agent Cassandra
Jackson, submitted in her application for an order permitting the
Government to intercept and record conversations between Simels and
Khan at the detention facility where Khan was detained pretrial. *See*
18 U.S.C. § 2518.  Agent Jackson stated the following:

> In or about March 2008, prosecutors for the government
> learned that Simels had lied to prison officials in an
> attempt to meet with [David Clarke], whom Simels and Khan
> suspected would be an important government witness in Khan's
> upcoming trial.  Specifically, on or about March 27, 2008,
> Simels went to the Queens Private Correctional Facility and
> asked to speak with [Clarke].   There was no publicly
> available information that [Clarke] was incarcerated at the
> Queens facility.  At that time, a corrections officer asked,
> consistent with the policy of the institution, whether
> Simels was [Clarke's] attorney of record.  Although Simels
> does not represent [Clarke], Simels responded that he did
> represent [Clarke].   Based upon Simels' representation,
> [Clarke] was removed from his cell and brought to the
> visitor's room for a legal visit.  When the door was opened,
> Simels introduced himself to [Clarke], saying, "I am Robert
> Simels."  When [Clarke] responded that he did not know who
> he was, Simels replied, "Well I know all about you,
> [Clarke]."
>
> . . .
>
> In or about May 2008, investigators met with [Vaughn].
> [Vaughn] was a former associate of Khan's who would provide
> information to Khan regarding the whereabouts of individuals
> who were sometimes subsequently murdered, threatened, and
> intimidated by members of Khan's para-military organization
> at Khan's direction. [Vaughn] reported to investigators that
> [Vaughn] had been notified by Khan's associates and others
> that Khan's attorney wanted to speak with [Vaughn].  Based
> on the communications that [Vaughn] received, as well as the
> nature of his prior relationship with Khan, [Vaughn] told
> the investigators that [Vaughn] believed Khan and his
> attorney wanted [Vaughn] to assist them in intimidating
> suspected government witness [Clarke], and possibly others.

We agree with Judge Gleeson that this information provided the
Government with a sufficient basis, after Vaughn's report to the
investigators, to send him to speak with Simels, assuming that such a

-10-

basis was needed.  Simels lied to prison officials, which resulted in his visit with a potential witness in Khan's trial.  More significantly, a reliable informant notified the Government that Khan's associates had told him that Simels wanted to speak with him and that Vaughn believed, from his prior activities on behalf of Khan, that Khan and Simels wanted Vaughn to assist in intimidating witnesses.  Simels discounts the significance of his false statement to prison authorities because, he contends, he was not required to be counsel for Clarke in order to visit him.  Nevertheless, the fact remains that he lied about his role as Clarke's attorney, and, at least in the context of assessing the Government's basis for investigating an attorney, a lie to criminal justice officials does not lose its capacity to arouse suspicion just because the lie might have been unnecessary.  In this case, the Government had a substantial basis to determine whether Simels was attempting to commit obstruction offenses, far more than a "mere recitation" of a need to investigate future criminal activity, *see United States v. Mastroianni*, 749 F.2d 900, 905 (1st Cir. 1984).[2]  The need to discover and prevent potential intimidation of witnesses was a stronger basis for sending Vaughn to meet with Simels than protection of an informant's identity, which we ruled a sufficient justification for the more intrusive step of

---

[2]As Judge Gleeson told Simels at sentencing, "[I]t was not only not overreaching to investigate you, but it would have been a dereliction of duty not to, given the facts available to the government . . . before Selwyn Vaughn was wired up and sent into your office."

allowing a cooperating witness to sit at counsel table, *see Ginsberg*, 758 F.2d at 832-33.   Moreover, there is no claim that privileged information was passed to the Government or that prejudice to Khan's defense resulted from Vaughn's contacts with Simels, circumstances we have indicated would establish a Sixth Amendment violation, *see id.* at 833.

II. Evidentiary Claims

We review a district court's evidentiary rulings for abuse of discretion.   *See United States v. Kelley*, 551 F.3d 171, 174-75 (2d Cir. 2009).   However, if a defendant fails to make a sufficient objection in the district court, the evidentiary claim is reviewed on appeal under the plain error standard.   *See* Fed. R. Crim. P. 52(b).

Simels first complains that the District Court improperly permitted Vaughn to give his opinion about what Simels's recorded statements meant, in violation of Federal Rule of Evidence 701. Simels asserts that the defense objected to the admission of this testimony, but he concedes that his counsel did not specifically mention Rule 701.   Whether or not counsel's objection was inadequate, as the government contends, the admission of Vaughn's opinions was not error. *See United States v. Tsekhanovich*, 507 F.3d 127, 129-30 (2d Cir. 2007); *cf. United States v. Brown*, 352 F.3d 654, 665 n.10 (2d Cir. 2003).

The District Court also properly permitted Vaughn to testify about threats made to him and about gang-related acts of intimidation in Guyana.   In his opening statement, Simels's counsel argued that, in exchange for his testimony, Vaughn had been paid more than $50,000 by

-12-

the Government and had received visas for himself and his family. Vaughn then testified that he and his family had been relocated to the United States for security reasons and that he could not return to Guyana because he would be killed.   The District Court did not exceed its discretion in ruling that the threat evidence was admissible, because it was relevant to rebut the defense attack on Vaughn's credibility.   Moreover, the court limited any possible prejudice by instructing the jurors that there was no suggestion that Simels had any role in the threats to Vaughn or his family.   The Court also did not err in admitting evidence about violence committed by gang members, evidence relevant to Vaughn's fear of reprisal.   To the extent that Vaughn testified about his own witness intimidation activities in Guyana at Khan's direction, activities of which Simels was likely aware, this evidence was admissible to provide a basis for Vaughn (and the jury) to understand the full import of many of Simels's statements to him.

     The Defendant next argues that, by repeatedly admonishing Simels to limit his answers to a "yes" or "no," the Court "conveyed to the jury that it did not believe Simels'[s] testimony." Appellant's Br. at 39, 42-43.   The facts of this case, however, are clearly distinguishable from those in *United States v. Filani*, 74 F.3d 378 (2d Cir. 1996), in which the trial judge "inappropriately intruded as an advocate during trial and thereby prejudiced defendant." *Id.* at 387. Here, the Court did not conduct its own adversarial questioning of the Defendant but merely interjected, when necessary, to defuse the obvious tension between the prosecutor and Simels.

-13-

The Defendant also claims that the Court violated his right to present a meaningful defense by precluding the introduction of a chapter that Simels had written in a 2006 book about cross-examination. Before trial, the Government objected to this evidence, asserting that it was irrelevant to Simels's state of mind, inadmissible hearsay, and its probative value was substantially outweighed by the danger of prejudice or confusion of the issues. After granting the Government's motion *in limine*, the Court advised Simels's counsel that he could renew his request to introduce the chapter during Simels's testimony. Counsel did not do so. Under these circumstances, although it might have been permissible to admit the chapter into evidence, the Court's decision to preclude such evidence did not exceed the Court's discretion.

None of the District Court's evidentiary rulings was erroneous.

III. Use of Suppressed Wiretap Evidence to Impeach

In response to the Government's mid-trial motion to admit portions of the previously suppressed MCC tapes, the District Court ruled that evidence obtained in violation of Title III could be admitted to impeach Simels's testimony. *See Simels II*, 2009 WL 4730232, at *5-*11. Simels contends that this decision "disregarded the language, structure, and purpose of Title III." Appellant's Brief at 56. As this Court recently acknowledged, Simels's Title III claim is one of first impression in this Circuit. *See SEC v. Rajaratnam*, 622 F.3d 159, 172 n.9 (2d Cir. 2010).

Although 18 U.S.C. § 2515 states that illegally obtained wire or oral communications may not be "received in evidence in any trial,"

the Government contends that we should nonetheless approve use of such communications for impeachment purposes, following the Supreme Court's use for impeachment purposes of evidence obtained in violation of the Fourth Amendment, *see Walder v. United States*, 347 U.S. 62, 65 (1954). As noted by the District Court in its written decision, *see Simels II*, 2009 WL 4730232, at *10, the Senate Judiciary Committee report on the bill that became Title III states that Congress did not intend to "press the scope of the suppression [rule] beyond present search and seizure law." S. Rep. No. 1097, 90th Cong., 2d Sess., at 68 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2184-85. The report explicitly cites *Walder*.

All of the circuits that have considered the issue have held that unlawfully obtained wiretap evidence may be used by the prosecution for impeachment in a criminal case. *See United States v. Baftiri*, 263 F.3d 856, 857-58 (8th Cir. 2001); *United States v. Echavarria-Olarte*, 904 F.2d 1391, 1397 (9th Cir. 1990); *United States v. Vest*, 813 F.2d 477, 484 (1st Cir. 1987); *United States v. Caron*, 474 F.2d 506, 508-09 (5th Cir. 1973); *see also Culbertson v. Culbertson*, 143 F.3d 825, 827-28 (4th Cir. 1998) (approving use of evidence obtained by unauthorized wiretapping for impeachment of party's affidavit in civil case); *Jacks v. Duckworth*, 651 F.2d 480, 483-85 (7th Cir. 1981) (permitting prosecution's use of evidence obtained by unauthorized wiretapping for impeachment as rebuttal evidence in criminal case). The Tenth Circuit has prohibited discovery of illegally obtained wiretap evidence in a civil case, distinguishing the cases permitting prosecution use for impeachment purposes in a criminal case on the

-15-

ground that the exclusionary rule, which *Walder* declined to apply to Fourth Amendment violations, did not apply to private individuals. *See Anthony v. United States*, 667 F.2d 870, 879 (10th Cir. 1982).

We agree with the courts applying the *Walder* rationale to evidence obtained in violation of Title III. As the First Circuit has pointed out, section 2515 cannot always be applied literally because doing so would preclude the use of illegally obtained wiretap evidence in a prosecution for violating Title III itself. *See Vest*, 813 F.2d at 480. And, as the Eighth Circuit has stated, "It makes no sense for evidence obtained in violation of a mere statute to be more severely restricted than evidence obtained in violation of the Constitution. At the time the statute was enacted, evidence obtained in violation of the Fourth Amendment could be used for impeachment purposes. It is reasonable to assume that Congress had this background in mind when the statute was passed, and that, in the absence of an express statement, it did not intend to draw the line of exclusion in a different place." *Baftiri*, 263 F.3d at 857.

IV. Electronic Surveillance Device Offenses

Simels seeks reversal of his convictions on Counts Twelve and Thirteen, contending that the relevant statutes punishing importation and possession of certain electronic surveillance devices do not apply to inoperable equipment.

The equipment that formed the basis of Counts Twelve and Thirteen consisted primarily of a device referred to at trial as a "base" (or sometimes a "chaise") and also two laptop computers. Peter Myers, a co-director of the company that manufactured the base, testified, on

questioning by the prosecutor, that the base permits surreptitious interception of radio signals between phones and cell towers and decodes the signals so that their content can be stored on a computer. Referring to the base seized from Simels's office, the prosecutor asked Myers, "It wouldn't work as it sits here today?" to which Myers answered "No." The reason, he explained, "could be a blown fuse" or "a component broken" or "something doesn't work." He also stated that, even if operational, it was "[u]nlikely" that the base would work in the United States without the cellular system that the base requires, a system that he said is "no where [*sic*] in America." Simels testified that the head of Guyana Telephone and Telegraph had told him that the company changed from analog to digital signals in 2004 or 2005.

With respect to the two laptops seized from Simels's office, Simels testified that the Guyanese government had given them to Khan to be used to store intercepted conversations and that a conversation involving David Clarke, a potential witness against Khan, was on one of the laptops. Simels also stated that he had the laptops shipped from Guyana and, in response to Government requests, turned over compact disks containing recorded conversations that he anticipated introducing into evidence at Khan's trial. With respect to the base, he testified that after the Government requested information as to how the recordings were made, he arranged for the base to be shipped from Guyana to his office "because we would have to produce it for inspection for the prosecutors."

The issue is whether importation and possession of an inoperable

–17–

device violates section 2512.  The Government contends that the statute covers such a device because it punishes importation and possession of "any electronic, mechanical, or other device, knowing or having reason to know that the *design* of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications." 18 U.S.C. § 2512(1)(a), (b) (emphasis added).  However, as the Appellant contends, even if the "design" of a device would render it useful for surreptitious interception of communications, the statutory definition of "electronic, mechanical, or other device" is "any device or apparatus *which can be used* to intercept a wire, oral, or electronic communication [with exceptions not relevant to this case]." 18 U.S.C. § 2510(5) (emphasis added).  Because the base was inoperable, which the Government does not dispute, it was not a "device" within the meaning of section 2512(1)(a), (b).

The Government resists this textual argument by analogizing to cases that have sustained convictions for firearms offenses despite the fact that a firearm was inoperable. *See United States v. Rivera*, 415 F.3d 284, 286 (2d Cir. 2005) (inoperable firearm qualifies as firearm because it is "designed to fire a projectile"); *United States v. York*, 830 F.2d 885, 891 (8th Cir. 1987) (same).  The analogy fails because a firearm is statutorily defined as any weapon "which will *or* is designed to *or* may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3) (emphases added).  Apparently concerned with the dangers that might arise from any gun that is "designed" to expel projectiles, Congress included such a gun

in the statutory definition in addition to a gun that "will" do so. However, with respect to electronic devices, Congress covered only those "which can be used" to intercept communications and added, as a *mens rea* requirement, that the device be known to have been designed for the purpose of surreptitious interception.

For these reasons the convictions on Counts Twelve and Thirteen must be vacated.  Because the District Court sentenced Simels to time served and no subsequent supervised release on these two counts, [3] their vacation does not require a remand for resentencing.  Nor is a retrial on the remaining counts required, as Simels contends, on a theory of retroactive misjoinder because of prejudicial spillover from evidence introduced on the vacated counts.  The Appellant has not met the "extremely heavy burden" of demonstrating that there was prejudicial spillover necessitating a new trial. *See United States v. Griffith*, 284 F.3d 338, 351 (2d Cir. 2002).  It will suffice to remand for entry of a corrected judgment reflecting the dismissal of Counts Twelve and Thirteen.[4]

---

[3]At sentencing Judge Gleeson said he was sentencing Simels to time served and "unsupervised supervised release." The judgment recites time served and "No supervision on Counts Twelve and Thirteen."

[4]We note Judge Gleeson's comments to the prosecutor concerning Counts Twelve and Thirteen:

> Those counts shouldn't have been brought.  The reason I think they shouldn't have been brought is Mr. Simels, I have no doubt, was endeavoring to get his hands on that equipment

V. Sufficiency of Evidence

Of the eight substantive counts charging attempted obstruction of justice through intimidation of eight potential witnesses against Khan, Simels challenges on appeal the sufficiency of the evidence to support his convictions on five counts. These relate to Vijay Jainarine, Ryan Pemberton, Alicia Jagnarain, Farrah Singh, and Vaughn, the confidential informant. Simels apparently concedes that the evidence was sufficient to support his conviction for attempted obstruction with respect to potential witnesses Clarke, Leslyn Camacho, and George Allison. Applying the well established standards for considering claims of insufficiency of evidence, *see*, *e.g.*, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ; *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004), we reject the Appellant's contentions.

At the outset, we note two considerations that apply to all five of the challenged counts. First, because the totality of the evidence, quite properly, was admitted without limitation to any particular count, the sufficiency of the evidence as to each potential witness need not be assessed, as Simels appears to contend, solely with respect to the evidence naming or referring to that witness. The jury was entitled to infer what Simels meant and what action he intended with respect to each witness not only from what was said about that witness but also from what he said about all the witnesses.

in preparation for the trial of Roger Khan, and the government wanted him to provide information about the nature of that equipment. For the life of me, I can't figure out why you indicted him, but that's your judgment."

-20-

An explicit instruction to intimidate or bribe one witness lends considerable color to what, in isolation, might be considered a somewhat ambiguous statement said with respect to another witness.

Second, the statements made by Simels to Vaughn must be assessed against the background knowledge Simels likely had about Vaughn's previous actions taken in Guyana on the instructions of Khan and members of the "Phantom Squad." Vaughn testified that on one occasion Khan asked him to verify the location of Donald Allison, an enemy of Khan's. Donald Allison was the brother of George Allison and a relative of David Clarke, both potential witnesses against Khan. Just after Vaughn informed Khan of Donald Allison's location, gunmen drove up and murdered him. On another occasion Khan instructed Vaughn to report the location of Ronald Waddelle, a talk show host who regularly criticized Khan. Vaughn did so, and gunmen drove up and murdered Waddelle. The jury was entitled to infer that Simels would not have trusted Vaughn sufficiently to give him instructions about bribing and intimidating potential witnesses against Khan unless he was aware of the type of assignments Vaughn had previously carried out for Khan. We assess the sufficiency of the evidence with these considerations in mind.

Vaughn testified that Simels and the co-defendant Irving made clear to him that, with respect to several of the potential witnesses against Khan, the attorneys wanted him "[t]o persuade the witness either not testify or to change their testimony" and that if he could not reach the witness directly "I can go through either their family members or friends." The key evidence against Simels was contained in

the recorded conversations between him and Vaughn.  Among the most damning portions of those conversations are the following:

•When Vaughn said to Simels, "We either try to buy them or we gotta drive fear in them," Simels replied, "I agree with you.  I agree with you."

•Simels handed Vaughn a memorandum summarizing expected testimony from several witnesses including Vaughn and said, "[H]e [Khan] really wants you to testify to all this shit."  The memorandum contained several facts that Vaughn knew were false.

•Simels handed Vaughn a draft of an affidavit he had prepared, which he wanted Leslyn Camacho, a girlfriend of Clarke, to sign.  The draft made assertions designed to impeach the credibility of Clarke, who was expected to be a prosecution witness against Khan.  Simels told Vaughn to deliver the affidavit to Camacho and tell her that she would be paid $10,000 if she testified as indicated in the affidavit.  Simels stated, "She's gotta meet with me.  If she does it and she signs the document, she gets half then and she gets half when she finishes testifying."  When Simels was arrested at his office, agents found a draft affidavit in the name of Leslyn Camacho.

•With respect to Clarke and Clarke's mother, Simels told Vaughn:

Listen. Whatever we gotta do, we gotta put Clarke in a bad setting is what we need to do.
. . .
[A]ll he [Khan] says is be careful.  He says "Don't kill the mother."
. . .
Well, he'd like as much pressure being put on Clarke as possible, but he thinks if Clarke's mother gets killed, that the government will go crazy.

•Simels told Vaughn, "Clarke is the guy we need to nail. . . . [W]e need to have him desire not to testify . . . ."

•Simels told Vaughn, "Clarke is either neutralized by us, or neutralized by us on cross-examination."

•Simels told Vaughn (regarding Clarke), "David's gonna want some money. . . . He's got that piece of property in Guyana, right, the hotel? . . . We could buy the hotel from him . . . so we said that the hotel was worth five thousand dollars, US, and you paid him fourteen thousand US. . . . Because nobody can say what the price of real estate is worth."

•Simels told Vaughn that he (Simels) needed to get in touch with Sean Bellfield so that Bellfield could find the brother of Vijay Jainarine, an expected prosecution witness against Khan, in Guyana "[s]o that [Bellfield] can convince Vijay to back off."

•The Government recorded conversations between Simels and Khan, in one of which Simels tells Khan, "I think you better get yourself . . . money.  Money, money, money.  We need money to sling at anything that [Vaughn] tells me is true."

In addition to these statements, Simels said other things to Vaughn specifically with respect to Vaughn's testimony.  Simels told Vaughn that, in order to undermine the identification of Khan as "Shortman," "we want to be able to put ourselves in the position of saying . . . anybody who is a short man [in Guyana] is Shortman . . . ."  Simels also told Vaughn to falsely identify himself as a "laborer," not to refer to Khan as the "boss" or connect Khan to drug trafficking, and to deny any business relationship between Khan and

–23–

Ricardo Rodrigues, whom Vaughn knew to be Khan's partner in the narcotics business.  When Vaughn expressed concern about how he would respond on cross-examination when he testified to matters allegedly occurring in Guyana that he knew were false, Simels told him not to worry because "none of these prosecutors have ever been to Georgetown or Guyana."  Simels also told Vaughn that he had heard many stories relating to Khan from "people . . . trying to help Roger" adding "whether they're true or they're not true.  Frankly, I, I, I actually don't care."

With respect to Vijay Jainarine, Simels told Vaughn, "We need [Jainarine's] brother to cooperate.  We need the brother to get his brother [Jainarine] to back off."  Simels gave instructions to send a copy of the Government's wiretap transcripts involving Jainarine to members of the Phantom Squad "and tell them to find this guy's brother."  He further instructed, "[T]hen tell Sean [Bellfield], when he locates him, to speak with me personally and I'll tell him what I want done . . . ."

With respect to Ryan Pemberton, after members of the Phantom Squad failed in an attempt to detain him and make him available to Simels on a trip to Guyana, Simels recounted to Vaughn what he had told members of the Phantom Squad:  "I said to them, 'Do you think you could tell Roger to his face what you're telling me, that you can't find this guy, that you can't bring him to me?  If he told you to bring somebody to him, ah, you bring him.'"  When a squad member apparently suggested that Simels leave Pemberton to the squad, Simels told Vaughn, "I said, 'If I leave him to you, he may be on the witness

stand in New York.'" Simels later told Vaughn that, after learning that Pemberton was willing to help Khan, "I said to Paul [Rodrigues], 'Good. If that's the situation, then he should be willing to fill out an affidavit from me. . . . I'll prepare the affidavit. You . . . have him sign it.'" A draft affidavit for Pemberton was found in Simels's office. Although Simels had never spoken with Pemberton, the draft affidavit stated, "I have no knowledge that Mr. Khan . . . ever committed any crimes of violence" and "I have over the course of many years made up stories about a number of people . . . claiming to have been involved in some illegal activities."

With respect to Alicia Jagnarain, Simels told Vaughn to find her and stated, "[I]f she didn't testify, refused to testify, uh, that would be good." He later said, "Alicia, obviously is somebody that, that we'd like to put pressure on" and "If we could persuade Alicia that she oughta talk to me and, ah, she, she has it in the back of her mind, that her, her, ah, involvement is not a good thing, great." Found on Simels's computer was a scanned letter from Khan to Paul Rodrigues giving instructions about bribing or threatening Jagnarain's parents in Guyana to a means of preventing her from testifying.

With respect to Farrah Singh, Simels instructed Vaughn to find her and said, "[S]he should be interested in whatever it takes to, a, say what we need her to say." Although this statement is not as probative as the other evidence in the case, assessed in conjunction with Simels's instructions to bribe and intimidate other witnesses, as the jury was entitled to do, it suffices to support the conviction on the count relating to her. And the evidence fully supports

convictions on the counts relating to the other witnesses.  As to each potential witness, Simels took a "substantial step" toward threatening or intimidating them with the intent to improperly influence their testimony in an official proceeding.  *See* 18 U.S.C. § 1512(b)(1), (2)(A).

Simels challenges his conviction on the five obstruction counts on two additional grounds.  He contends that the evidence was insufficient to satisfy the so-called "nexus requirement," *United States v. Kaplan*, 490 F.3d 110, 125 (2d Cir. 2007), a relationship between the obstructive conduct and a judicial proceeding, *see Arthur Anderson LLP v. United States*, 544 U.S. 696, 707-08 (2005); *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995).  However, the evidence fully entitled the jury to find that Simels attempted to intimidate or bribe witnesses whom he expected would be witnesses at Khan's trial.  And the evidence was equally persuasive that Simels was not entitled to the safe harbor defense of "the providing of lawful, bona fide, legal representation services." 18 U.S.C. § 1515(c).

VI. Sentencing Issues

Simels challenges his sentence on three grounds.  First, he contends that the District Court erroneously applied an aggravating three-level role adjustment for being a supervisor of a criminal activity involving five or more participants, *see* U.S.S.G. § 3B1.1(b).  However, the District Court properly identified Khan, Irving, Hanoman, Colin Moore, and Conrad Sanmoogan as members of the conspiracy to obstruct Khan's trial, and Simels's contention that this finding is clearly erroneous is without merit.

–26–

Second, Simels contends that the District Court imposed the 14-year sentence under the misapprehension that the sentence could be served at a minimum security institution, whereas the Bureau of Prisons ("BOP") will not designate such a facility for a prisoner sentenced to more than 10 years, unless the Bureau waives this provision. *See* BOP Program Statement 5100.08, ch. 5, p. 9 ¶I(A), http://www.bop.gov/DataSource/execute/dsPolicyLoc (5000 Series) (5100.08 Inmate Security Designation and Custody Classification, ch 5, p. 9) (last visited July 29, 2011). After Judge Gleeson completed imposition of sentence, defense counsel requested that the Judge recommend incarceration at the Otisville Federal Prison Camp, a minimum security institution near Simels's home. Judge Gleeson agreed to make the recommendation. Three days later, defense counsel wrote the District Court to point out that a BOP waiver was needed to permit incarceration at Otisville and to request that Judge Gleeson recommend a BOP waiver. The record discloses no action on this request. Two weeks later, after the BOP had selected a federal prison in Texas for incarceration of Simels, defense counsel wrote the District Court to request a recommendation that the BOP imprison Simels in the Northeast Region. Judge Gleeson denied this request.

It is clear from this sequence of events that Judge Gleeson did not become aware until after imposition of sentence that incarceration at Otisville, which he recommended, required a BOP waiver. Thus, contrary to Simels's contention, the sentence was not imposed under a misunderstanding of facts that would impair the validity of the sentence. *Cf. King v. Hoke*, 825 F.2d 720, 724-25 (2d Cir. 1987)

(misunderstanding of minimum period of incarceration required resentencing).

Finally, Simels contends that the length of his sentence was unreasonable. The applicable Guidelines range was 168 to 210 months. Judge Gleeson imposed concurrent sentences of imprisonment for 168 months, the bottom of the applicable range, on the conspiracy count and the eight obstruction of justice counts; a concurrent sentence of 24 months on the bribery count; and time served on the electronic device counts. He also fined Simels $25,000 and imposed a three-year term of supervised release.

We review a sentence for substantive reasonableness, *see United States v. Cavera* , 550 F.3d 180, 187 (2d Cir. 2008) (in banc), and a sentence within the applicable Guidelines range will generally be considered reasonable, *see Rita v. United States*, 551 U.S. 338, 350 (2007); *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006). A 14-year sentence for a 62-year-old man with no prior record is doubtless a severe sentence, but, as Judge Gleeson carefully explained,

> [A]n important goal of sentencing is just punishment, is the way we express our condemnation of conduct that must be condemned, and anybody who takes the time to look at the facts of the case knows that you're being punished for your efforts to suborn perjury, to bribe witnesses, to otherwise influence witnesses, and for your own perjury at your trial.

We cannot say that the sentence is unreasonable.

## Conclusion

We affirm the convictions and sentences on Counts One through Ten, vacate the convictions and sentences on Counts Twelve and Thirteen, and remand for entry of a judgment corrected to reflect these rulings.