# JUDICIAL CONFERENCE OF THE UNITED STATES

STATEMENT OF

JUDGE REGGIE B. WALTON
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA



BEFORE

THE SUBCOMMITTEE ON CRIME AND DRUGS

COMMITTEE ON THE JUDICIARY

UNITED STATES SENATE

ON

"FEDERAL COCAINE SENTENCING LAWS"

February 12, 2008

Thank you for affording me the opportunity to appear before you today on behalf of the Judicial Conference of the United States and to convey my own experience and perspectives on this very important matter. The disparity between sentences imposed for powder-form cocaine and cocaine base ("crack") is one of the most serious challenges facing the federal criminal justice system today, and I am grateful for the chance to share the views of the courts.

Most informed commentators now agree that the infamous 100-to-1 ratio between crack and powder is unwarranted,[1] but legislative remedies have proved elusive. Some believe that the answer lies in reducing the penalties associated with crack; others believe that the answer lies in increasing the penalties associated with powder; others believe that the penalties associated with powder should be increased *and* that crack penalties should be reduced. Any of these approaches, if adopted by Congress, will have reverberating consequences for the criminal justice system: while the Sentencing Commission estimates that there are 19,500 inmates eligible for sentence reduction, there are more than 26,383 inmates in the custody of the Bureau of Prisons whose offenses involved crack[2] (approximately 13 percent of the total prison population).[3]

---

[1] *See* U.S. SENTENCING COMM'N, REPORT TO THE CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY (May 2007) [hereafter, U.S. SENTENCING COMM'N, 2007 REPORT].
> Federal cocaine sentencing policy, insofar as it provides substantially heightened penalties for crack cocaine offenses, continues to come under almost universal criticism from representatives of the Judiciary, criminal justice practitioners, academics, and community interest groups, and inaction in this area is of increasing concern to many, including the Commission.

*Id.* at 2.

[2] *See* U.S. SENTENCING COMM'N, *Analysis of the Impact of the Crack Cocaine Amendment if Made Retroactive* (Oct. 3, 2007), *available at* http://www.ussc.gov/general/Impact_Analysis_20071003_3b.pdf.

[3] Federal Bureau of Prisons, Inmate Population as of December 29, 2007, was 199,616 http://www.bop.gov/news/quick.jsp. In 2006, there were 5,397 individuals sentenced in federal

1

In recent years, the disparity between crack and powder cocaine sentences is a subject that has captured the attention of the Criminal Law Committee (of which I am a member) and the Judicial Conference. In June 2006, the Criminal Law Committee discussed the fact that 100 times as much powder cocaine as crack is required to trigger the same five-year and ten-year mandatory minimum penalties, resulting in crack sentences that are 1.3 to 8.3 times longer than their powder equivalents.[4] The Committee concluded that the disparity between sentences was unsupportable, and that it undermined public confidence in the courts. Upon the Committee's recommendation, in September 2006, the Judicial Conference voted to "oppose the existing differences between crack and powder cocaine sentences and support the reduction of that difference."[5] I conveyed that view on behalf of the Criminal Law Committee at a Sentencing Commission hearing on cocaine sentencing policy in November 2006.[6] In 2007, the Sentencing Commission, implementing the policy conclusions that follow from its series of special congressional reports on cocaine and sentencing policy,[7] amended downward the guideline for

---

courts for crack, compared to 5,744 sentenced for powder cocaine. Between 1996 and 2006, the number of sentenced crack offenders ranged from 4,350 to 5,397. U.S. SENTENCING COMM'N, 2007 REPORT, *supra* note 1, at 12 (Figure 2-1).

[4]*See* U.S. Department of Justice, *Federal Cocaine Offenses: An Analysis of Crack and Powder Penalties* 19 (Mar. 17, 2002), *available at* http://www.usdoj.gov/olp/cocaine.pdf/crack_powder2002.pdf

[5]JCUS-SEP 06, p. 18.

[6]*Public Hearing on Cocaine Sentencing Before the U.S. Sentencing Comm'n* 103-111 (Nov. 14, 2006) (testimony of Judge Reggie B. Walton), *available at* http://www.ussc.gov.

[7]The Commission has repeatedly condemned the crack-powder disparity in its reports to Congress. *See, e.g,.* U.S. SENTENCING COMM'N, 1995 SPECIAL REPORT TO CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY (Feb. 1995); U.S. SENTENCING COMM'N, 1997 SPECIAL REPORT TO THE CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY (Apr. 1997); U.S. SENTENCING COMM'N, 2002

2

crack cocaine.[8] And Congress, with virtually no debate or opposition, permitted the amendment to move forward and become effective on November 1, 2007.

Soon thereafter, I testified before the Commission on the issue of retroactive application of its guideline amendment for crack.[9] The Criminal Law Committee of the Judicial Conference recommended that the amendment should be made retroactive,[10] and on December 11, 2007, the Commission voted unanimously to apply the guideline retroactively.[11] This was a courageous and promising first step in ameliorating the disparity that exists between crack and powder sentences. But as the Commission itself acknowledges, the promulgation of the guideline amendment was only a partial solution to a much-larger problem, and the ultimate solution lies with Congress.

Congress established the crack-powder disparity with the passage of the Anti-Drug Abuse Act of 1986.[12] Legislative history suggests that it did so not out of contempt for the Sentencing Reform Act of 1984 (which, *inter alia*, sought to eliminate unwarranted sentencing disparity in

---

REPORT TO THE CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY (May 2002); U.S. SENTENCING COMM'N, 2007 REPORT, *supra* note 1.

[8]Notice of Submission to Congress of Amendments to Sentencing Guidelines Effective November 1, 2007, 72 Fed. Reg. 28558 (May 21, 2007).

[9]*Public Hearing on Retroactivity Before U.S. Sentencing Comm'n* 14-20 (Nov. 13, 2007)(testimony of Judge Reggie B. Walton), *available at* http://www.ussc.gov.

[10]Letter from Judge Paul G. Cassell, Chair, Committee on Criminal Law of the Judicial Conference of the U.S., to Ricardo H. Hinojosa, Chair, U.S. Sentencing Comm'n (Nov. 2, 2007), *available at* http://www.ussc.gov.

[11]Press Release, U.S. Sentencing Comm'n, U.S. Sentencing Comm'n Votes Unanimously to Apply Amendment Retroactively for Crack Cocaine Offenses (Dec.11, 2007), *available at* http://www.ussc.gov.

[12]Pub. L. 99–570, 100 Stat. 3207 (1986).

the federal courts),[13] but because it held a particular set of beliefs about crack cocaine. For example, the record reflects Congress's concern that crack cocaine was uniquely addictive,[14] was associated with greater levels of violence than was powder cocaine,[15] and was especially damaging to the unborn children of users.[16]

I understand the circumstances under which Congress passed the 1986 Act because many of those same beliefs about crack cocaine were in force during the late 1980s, when I served as the White House's Associate Director of the Office of National Drug Control Policy. But twenty years of experience have taught us all that many of the beliefs used to justify the 1986 Act were wrong. Research has shown that the addictive properties of crack have more to do with the fact that crack is typically smoked than with its chemical structure.[17] The national epidemic of crack

---

[13]See, e.g., 18 U.S.C. § 3553(a)(6)(2007) ("The Court, in determining the particular sentence to be imposed, shall consider...the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"); 28 U.S.C. § 991(b)(1)(B)(2007) ("The purposes of the United States Sentencing Commission are to...provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct").

[14]See, e.g.,. U.S. SENTENCING COMM'N, 2002 REPORT TO THE CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY (May 2002) 93, *available at* http://www.ussc.gov/r_congress/02crack/2002crackrpt.htm ("Crack cocaine can only be readily smoked, which means that crack cocaine is always in a form and administered in a manner that puts the user at the greatest potential risk of addiction.").

[15]See, e.g., *id.* at 100 ("An important basis for the establishment of the 100-to-1 drug quantity ratio was the belief that crack cocaine trafficking was highly associated with violence generally.").

[16]See, e.g., *id.* at 94 ("During the congressional debates surrounding the 1986 Act, many members voiced concern about the increasing number of babies prenatally exposed to crack cocaine and the devastating effects such exposure causes.").

[17]See, e.g.,. U.S. SENTENCING COMM'N, 2007 REPORT, *supra* note 1, at 63 (linking risk of addiction to mode of administration).

4

use that many of us feared never actually materialized,[18] and recent studies suggest that levels of violence associated with crack are stable or even declining.[19]

Because experience has shown that many of the foundations of the 1986 Act were flawed, and because the existing disparity may actually frustrate (instead of advance) the goals of the Sentencing Reform Act,[20] there is now widespread support by many in the United States to reduce the existing sentencing disparity between crack and powder cocaine.[21]

The federal courts must be fundamentally fair, but that is not enough: they must also be *perceived as fair* by the public. And today, that is not always the case. More than once, I have had citizens refuse to serve on a jury in my courtroom because they are familiar with the existing disparity between crack and powder sentences, and believed that federal statutes (and the courts that interpret those statutes) are racist.

I do not believe that the 1986 Act was intended to have a disparate impact on minorities, but while African-Americans comprise approximately only 12.3 percent of the United States population in general,[22] they comprise approximately 81.8 percent of federal crack cocaine

---

[18]*See id.* at 72-76 (noting that use of crack has been very stable in recent years).

[19]*See id.* at 86-87 (reporting research showing declining levels of actual violence).

[20]*See id.* at 8 ("[T]he Commission maintains its consistently held position that the 100-to-1 drug quantity ratio significantly undermines the various congressional objectives set forth in the Sentencing Reform Act.").

[21]*See e.g., Public Hearing on Cocaine Sentencing Policy Before the U.S. Sentencing Comm'n* (Nov. 13, 2006), *available at* http:www.ussc.gov

[22]www.census.gov/main/www/cen2000.html (follow American Fact Finder; then follow Fact Sheet link).

5

offenders, but only 27 percent of federal cocaine powder offenses.[23] (Hispanics, though, account for a growing proportion of powder cocaine offenders. "In 1992, Hispanics accounted for 39.8 percent of powder cocaine offenders. This proportion increased to over half (50.8%) by 2000 and continued increasing to 57.5 percent in 2006."[24]) Furthermore, because crack offenses carry longer sentences than equivalent powder cocaine offenses,[25] African-American defendants sentenced for cocaine offenses wind up serving prison terms that are greater than those served by other cocaine defendants.[26] I have a concern that disparate impact of crack sentencing on African-American communities shapes social attitudes. When large segments of the African-American population believe that our criminal justice system is racist, it presents the courts with serious practical problems. People come to doubt the legitimacy of the law–not just the law associated with crack, but *all* laws. I have experienced citizens refusing to serve on juries, and there are reports of juries refusing to convict defendants.[27] Skepticism about the judiciary also

---

[23]U.S. SENTENCING COMM'N, 2007 REPORT, *supra* note 1, at 15 ("Historically the majority of crack cocaine offenders are black, but the proportion steadily has declined since 1992: 91.4 percent in 1992, 84.7 percent in 2000, and 81.8 percent in 2006.").

[24]*Id.* at 15.

[25]*See supra* note 4 (noting crack sentences that are 1.3 to 8.3 times longer than their powder equivalents).

[26]*See, e.g.,* U.S. SENTENCING COMM'N, 2007 REPORT, *supra* note 1, at B-18 ("In 1986, before the enactment of the federal mandatory minimum sentencing for crack cocaine offenses, the average federal drug sentence for African Americans was 11 percent higher than for whites. Four years later, the average federal drug sentence for African Americans was 49 percent higher than for whites.").

[27]*See* William Spade, Jr., *Beyond the 100:1 Ratio: Towards a Rational Cocaine Sentencing Policy*, 38 ARIZ. L. REV. 1233, 1282 (1996) ("Moreover, the 100:1 ratio is causing juries to nullify verdicts. Anecdotal evidence from districts with predominantly African-American juries indicates that some of them acquit African-American crack defendants whether or not they believe them to be guilty if they conclude that the law is unfair." (citing Jeffrey

presents us with symbolic problems. The facade of the Supreme Court of the United States is an evocative image, an icon that connotes the rule of law. It is important that the federal courts are recognized as places in which the citizens stand as equals before the law. If, instead, some segments of the population view the courts with scorn and derision, as institutions that mete out unequal justice, the moral authority of the federal courts is dimmed.

The Judicial Conference strongly supports legislation to reduce the unsupportable sentencing disparity between crack and powder cocaine. The Criminal Law Committee and the Judicial Conference have no established view on whether the disparity should be reduced by raising penalties for powder, reducing penalties for crack, or through some combination of both approaches,[28] but Congress may find it prudent to reconsider whether existing minimum penalties are necessary to achieve the goals of sentencing. This would be consistent with the parsimony provision of the Sentencing Reform Act.[29]

Although the Judicial Conference does not have an established view on how to reduce the disparity, it does have an established and longstanding opposition to mandatory minimum penalties.[30] For more than thirty years, it has been the view of the Judicial Conference that mandatory sentences unnecessarily prolong the sentencing process, increase the number of

---

Abramson, *Making the Law Colorblind*, N.Y. TIMES, Oct. 16, 1995, at A15); Symposium, *The Role of Race-Based Jury Nullification in American Criminal Justice*, 30 J. MARSHALL L. REV. 911 (1997).

[28]For specific legislative recommendations, see, *e.g.*, U.S. SENTENCING COMM'N, 2007 REPORT, *supra* note 1, at 8-9.

[29]*See* 18 U.S.C. § 3553(a) (2007).

[30]*See, e.g.*, JCUS-OCT 71, p. 40; JCUS-APR 76, p. 10; JCUS-SEP 81, pp. 90, 93; JCUS-MAR 90, p. 16; JCUS-SEP 91, p. 56; JCUS-MAR 93, p. 13; JCUS-SEP 93, p. 46; JCUS-SEP 94, p. 42; JCUS-SEP 95, p. 47 (all opposing mandatory minimum sentences).

criminal trials and engender additional appellate review, and increase the expenditure of public funds without a corresponding increase in benefits.[31] Accordingly, as a general matter, the Conference favors legislation that leaves sentencing decisions to judges, those individuals best situated to apply general rules to the particular circumstances. Crack legislation that increases the drug weights required to trigger mandatory minimum penalties would be more consistent with Judicial Conference policy inasmuch as they narrow the pool of defendants subjected to mandatory minimum provisions.

I would like to thank you for the opportunity to testify before you today. The disparity in crack and powder sentences is an important issue with both symbolic and practical consequences for the federal courts. I believe that existing cocaine policy in general, and the 100-to-1 ratio in particular, has a corrosive effect upon the public's confidence in the federal courts. As a representative of the Judicial Conference and as a sentencing judge who is regularly called upon to impose sentences on crack defendants, I encourage Congress to pass legislation that would reduce the disparity between crack and powder cocaine sentences.

I thank you for your attention and would be happy to answer any questions that you might have.

---

[31]JCUS-APR 76, p. 10; JCUS-SEP 81, pp. 90, 93.

## DECLARATION REGARDING FILING AND SERVICE

I, Melanie Quiles, hereby declare that, on February 16, 2009, the Motion Under 18 U.S.C. § 3582(C)(1)(B) to Modify an Imposed Term of Imprisonment to the extent otherwise Expressly Permitted by 28 U.S.C. § 2255(a) and (b) to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody was filed with the United States Attorney's Office Eastern District of New York by regular mail within the State of New York on:

**United States Attorney's Office**
**Eastern District of New York**
**271 Cadman Plaza East**
**Brooklyn, New York 11201**

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: Bronx, New York
February 16, 2009

_____
MELANIE QUILES

Sworn to before me this

_16_ day of _February_, 2009

_____
Notary Public

**Zachary Glampa**
**Notary Public, State of New York**
**No. #02GI6168723**
**Qualified in New York County**
**Commission Exp. 06-18-_2011_**